Alberino v. Balch, No. 582-10-00 Wncv  (Katz, J., Aug. 24, 2005)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT                                      SUPERIOR COURT
Washington County, ss.:                          Docket No. 582-10-00 WnCv


ALBERINO

v.

BALCH


FINDINGS OF FACT
CONCLUSIONS OF LAW
NOTICE OF DECISION


        On the basis of the evidence presented in court on August 15, 2005, the following decision is announced.

FINDINGS OF FACT

1.        The fence installed by Alberino consists of many 4 x 8 sheets of plywood, which have turned grey from weathering without any paint or

other finish.  The sheets are installed vertically, resulting in an eight foot high fence.  Because the sheets are not adjusted for the terrain, the tops are irregularly arrayed, one next to the other.  In short, the fence is an ugly wall.  As Balch mows his lawn, the fence is easily viewed from his yard.  By contrast, Alberino's lands leading up to the fence is wooded; leaving the fence barely visible from her house or yard.

2.        The fence serves no objective purpose.  It does not keep out noise, either from Alberino's dogs or Balch's portable saw mill.  It will not keep small dogs in, as they could crawl under the irregularly mounted bottoms of the sheets.  It serves no real privacy purpose, given the extensive woods between the fence and Alberino's house and hot tub.  Although Balch has taken many photos of dogs on his property, there is no reason to believe he ever watched or photographed any hot tub or other private activities, the ostensible purpose of the fence.

3.        Alberino currently has five pomeranians and a papillon—six dogs, each weighing between six and ten pounds.  They bark.  The court is not persuaded, however, that their barking is particularly incessant.  We are persuaded that Alberino is very solicitous of her dogs.  In part, this is because she believes Balch shot one some years ago.  Whether he did, or not, is not the question.  What is significant here is that she believes he did.  For that reason, she does not permit them to run about, outside her presence.  When inside the house, their barking is not all that bothersome at Balch's house, which is several hundred feet distant.  She does not leave them unattended outside the house.  Very occasionally, one has gotten out.  Her son's dog has gotten out of their yard, and strayed onto Balch's.  When that occurred, Balch held the dog—inside his house—and called the town dog warden.  From the point of view of Alberino, this was holding the dog for ransom.  Again, whether that is true is really of no consequence.  Because she believes that is the intent of her neighbor, she exercises care that neither her dogs nor that of her son or any guest be permitted to stray

onto Balch's land.  While not a perfect insurance against such straying, it probably is more effective than any other.

4.      We are not persuaded that there have been any recent incidents of mowing grass by Alberino or her employees or guests other than between 9 a.m. and 5 p.m.

5.      A previous decision by this court held Alberino to have possessed a very small triangle of property, as against Balch, by adverse possession.  To ensure that she does not further encroach onto his lands, Balch has hammered two sections of half-inch steel "rebar," spray painted red, at the declared boundary.  These bars are perhaps two feet in height above the ground.  It is inevitable that a snow plow will knock them over.  They also pose a threat to the paint finish of any vehicle in the vicinity.  In their own way, they overextend the right to mark a boundary in the same spirit as the fence discussed above.

6.      We are not persuaded that the small flood-type light bulb on Alberino's house is glaring onto Balch's property.


CONCLUSIONS OF LAW


1.      A spite fence is one which is of no beneficial use or pleasure to the owner, but was erected and is maintained for the purpose of annoying a neighbor.  See Sundowner, Inc. v. King, 509 P.2d 785, 786 (Idaho 1973); see also 24 V.S.A. § 3817 (unnecessary fence; maintenance prohibited; penalty).  Whether a particular fence comes within this definition is determined from its character, location, or use—would it strike an ordinary viewer as manifestly erected to annoy the adjoining owner.  1 Am.Jur.2d Adjoining Landowners § 111.  The significance of this latter rule is that the fence is to be judged by objective standards, more than some weighing of

the particular motives of the person who erected it. Annoyance need not be the exclusive purpose of the fence, but only the dominant or primary purpose. See DeCecco v. Beach, 381 A.2d 543, 545 (Conn. 1977).

2.      Although Balch testifies that "this material is completely unsuited to use in fencing," in fact, plywood sheets are not unknown around Vermont. They are used by junk yards, which must hide the inventory from the outside. But junk yard operators typically paint their plywood fences, something not done here. Is this not evidence of the fence-owner caring nothing about the negative visual effect of her fence upon the neighbor's property, which it faces?

3.      A party suffering a spite fence is entitled to a injunction ordering its removal. Haugen v. Kottas, 2001 MT 274, ¶ 14; 1 Am.Jur.2d Adjoining Landowners § 117.

4.      Any injunction requiring a dog owner to maintain control over the wanderings of her dogs suffers an inherent problem—can any person effectively control a group of dogs? To hold the dog-owner in contempt, would mean that we would have to find either a wilful violation, or at least a substantial failure to attempt compliance with the injunction. See Matthews v. Riley, 162 Vt. 401, 413 (1994) (permitting finding of contempt where party "though able, refuses to comply" with order). Although it is conceivable that compliance would require walking each of the dogs on a leash, such was never explicitly required in the injunction presently outstanding. Further, in a rural area such as this, such would be at least somewhat unusual The difficulty of making a finding of contempt is fortunately unnecessary here, as the factual context permits us to conclude that Alberino has made reasonable efforts to keep her dogs off the property of Balch. She is afraid of what would happen if she did not. She is afraid of what has happened, when her son's dog wandered onto Balch's property—in her view Balch "held it for ransom."

NOTICE OF DECISION


Alberino shall remove the plywood fence panels.  Should she choose to install some sort of wire fencing, to keep in animals, using existing posts, that would presumably not be a spite fence, it being far less visible than the current delaminating panels.  Balch's other requests that she be held in contempt of existing orders are denied.  Counsel for Alberino to submit a proposed declaratory judgment, suitable for recording, to recount all grants of final relief.


Post Script


Most fence cases in Vermont seem to revert to quotation of Robert Frost's thesis that "good fences make good neighbors."  Perhaps a logician would infer that the converse of Frost's proposition is also true here: bad fences make bad neighbors.  But thinking about Frost's statement, we have in mind that it arose in considerably different circumstances.  Frost's "Mending Wall" speaks of a stone wall, which "spills the upper boulders in the sun;" of which hunters "left not one stone upon another stone;" of "Bringing a stone grasped firmly by the top in each hand."  Were these two neighbors to share the time and labor to build such a wall, of piled stones, and thereby get to know one the other, such a fence might make good neighbors.


Dated at Montpelier, Vermont, _____, 20__.

_____
Judge